Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Thank you, Shirley. Good morning, counsel. Morning. Morning. This is getting to be the normal approach to oral argument, but maybe we can make it, you know, we're rear view mirror one of these days. Mr. Hanson, where are you located? I am in Austin, Texas, your honor. How about you, Mr. Whitburn? I'm in Arlington, Texas, your honor. Well, let us consider all of us to be in New Orleans. The fake background for three judges is from our courtroom, but all of us are in Jackson, Mississippi. We only have one argument for today. Harmony Haus Westlake v. Parkstone et al. 25-0185. Mr. Hanson, I think you are first up. Why don't you proceed? Judge Southwick, and may it please the court. I'm Eric Hanson and I represent the Parkstone Property Owners Association, the appellate. Recovering addicts do not have a handicap unless they are substantially limited in a major life activity. Without evidence that future residents have a substantial limitation in a major life activity, Harmony Haus was not entitled to an accommodation under the Fair Housing Act. The briefs show there was no such evidence in this case. Even when handicap has been established, Harmony Haus also had to show that the housing was necessary that 12 residents were necessary to the equal use and enjoyment of the dwelling. And that simply hasn't occurred here. After all, Harmony Haus claims that it is a unique model. Did you have a question, Judge Southwick? I'm sorry. No, I was actually adjusting something on my screen. Sorry to interfere. Just want to make sure with Zoom, it's always a unique format, so. We'll orally ask questions if we need you. Sure, so with 12 residents, Harmony Haus claims that they have this unique model, but there's no evidence or other statistics that show that that model is successful in treating sober living. And there's no evidence either that that model is better than the alternative that Parkstone offered of six residents. And because of that, and for other reasons set forth in our briefs, we respectfully request that the district court's judgment be reversed. I'd like to go and focus on that first argument on a handicap. The Fifth Circuit has been clear since Birch v. Coca-Cola in 1997, that being an alcoholic or recovering addict is not enough. You have to actually show a substantial limitation in a major life activity. Several residents testified at trial about their current situations, but that doesn't mean that other residents in the home have any substantial limitations in a major life activity. Mr. Hanson, the other side, Harmony Haus will certainly have to address this as well. No surprise, but my concern on that is that I certainly think there's something to your argument that it has to be more than just alcoholism and it has to have the effect that the Fair Housing Act requires. Current residents, evidence that they do, it seems to me the issue is whether the, well, at least a possible issue is whether the qualifications to be a resident of Harmony Haus fit with what is required under the Fair Housing Act and what's your take on future residents before they would be admitted to Harmony Haus, what their condition has to be? How do we know what that is? Well, here we don't know that, Judge Southwick, and that's part of the problem. The admissions criteria here don't really have any questions whatsoever about substantial limitations in major life activities. And to use kind of an analogy to the employment arena with the Americans with Disabilities Act, when a private company wants to know if someone is disabled, they can make more inquiries about that. For example, they can send a questionnaire to a healthcare provider. And so, similarly here, what Harmony Haus could have done but doesn't do is they can certainly have questions that probe both whether there's an impairment, but also what are the substantial limitations in major life activities? And if you look at the admissions criteria for Harmony Haus, they don't probe for that. It is a luxury, high-end, sober living model that seems to be a little bit more focused on just whether someone can pay and if they're an appropriate fit versus whether they truly are handicapped. And also, it does seem to me that the evidence is that the current residents, a significant number, all of them are pretty good fit. We'll have to decide whether it's a sufficient fit with what the Fair Housing Act requires. That is at least some evidence of what the future residents would look like, regardless of the written criteria, is it not? That sounds like, I don't think that's accurate. It's an individualized inquiry. I think that is some evidence of their particular situations. Witness DJ and Montana Harris gave testimony about that for them, but there's no evidence that that's typical of other residents in the house on the issue of substantial limitations in major life activities. The evidence is a little bit more on the impairment side and sober living homes. What is your evidence in your view of current residents who would not fit the Fair Housing Act model? Yes, Your Honor. Judge Southwick, that's Witness KS, because he specifically said that he was not substantially limited in any major life activities. He testified that he did not have any relapse issues ever, and he was feeling fine for over the past year. Harmony House started this particular dwelling in, or took over this dwelling in October of last year. And so he basically entered Harmony House as a non-handicapped individual based off the testimony from the trial. Said he didn't have any substantial limitations currently. So I think even if you're looking at the current residents that testified, there's indications that Harmony House's screening procedures do not limit people that are handicapped. I mean, we could see that with Witness KS. So I think because of that, and there's a substantial portion of the briefing devoted to that, that if the current residents, when you're looking at the people that testified, show situations where someone is not handicapped, then I don't think you met your burden. And there's- Let me ask you from this perspective, it seems to me there are certainly better evidence on some than on others, from your view of some of the residents would qualify on your interpretation of what is required on the Fair Housing Act. It seems to be part of the model for Harmony House is this mix. Is this cross-section where one group better off are helping the newer members who are just getting the benefits of this sort of group living. It seems to me part of Fair Housing Act would say that in order to serve the interests of those who are sufficiently limited in some activity, receive the benefits of this living, you need people who do have this cross-section. So you need some people there who are better off. Wouldn't that be sufficient? I don't think so, Your Honor. I mean, I think that the test is, you know that you have to show what are the substantial limitations and I still can't really tell. I mean, if you have some residents who have that, who meet that test and others are there who have their own problems but are necessarily better off in order to make the program work for those who indeed are sufficiently limited. It seems to me that at least is an argument as to why this is sufficient. Judge Southwick, I think there's two ways you could write the opinion here, which would still be different. I bet there are more than two, but go ahead. Well, that's fine too, but there's always more than two. But I think the two ways the opinion could be written that at least to comply with past precedent is either the standard is you have to show current and future residents, and here we don't have any evidence of future residents. So you didn't meet your burden of proof and you get no accommodation whatsoever. Or you could write the opinion of you only get what you actually proved at trial. And that is a more moderate way to write the opinion. And I think in that interpretation, I think it encompasses the examples that you're talking about. If people more clearly fit within the definition of handicap then that's what you get at trial. I mean, this was a full-scale trial on the merits and the court can certainly make a finding as to what was actually proven at that level to account for that level of specificity of different levels of people in the home. Well, let me ask you, it seems to me your argument indicates that if someone is the director of it who has no arguable handicap is indeed there because he or she does not, under your interpretation, that person could live there. Is that your take? If they're not handicapped? Yeah, they're there to assist, to help with those who are handicapped. Are you saying that nobody can be in this house? Who has no handicap at all because of their role in helping the others? They wouldn't be entitled to an accommodation under the Fair Housing Act is the answer to that, your honor. So if they're not handicapped, I mean, you can have someone there. The issue just becomes whether it violates, at least in this particular case, the lodging house or the single family use restriction. But no accommodation is owed if they're not handicapped. That would be the correct legal answer in that situation. I want to move on to the rest of your argument. You're well over halfway through. Sure, I'd like to focus on the necessity argument. And the necessity argument here, it doesn't require a superior housing advantage. I think the Vorkheimer decision from the Third Circuit Court of Appeals is excellent here because it talks about the necessity requirement being a stringent legal standard. And the problem here is Harmony House is saying that they have this unique model, but yet there's no statistics or other data that shows its effectiveness at different residency levels. There's no data that shows that it's better than the typical sober living home model, which is the gold standard is the Oxford House model. And that typically operates at a lower number of residents. And there simply is no evidence that shows that the Harmony House model is effective. We have this vague conclusory critical mass theory, which seems to be a moving target. And several circuits that have evaluated the necessity requirement, the Fourth and the Sixth Circuits and Bryant Woods and Smith and Lee have found that kind of a range of what is required under the necessity element is about six to eight residents. Here we have 12 residents as being granted. So we are certainly on the fringes and an outlier from what has traditionally been accepted in at least two other circuit courts. And I think the problem is that Harmony House has a theory about why 12 residents is beneficial, but it has no evidence that it works better than a traditional six to eight person Oxford House program. And even if you look, for example, at the Oxford House versus Browning case from the Middle District of Louisiana, it goes into an extensive analysis. So what about the testimony of Dr. Baer, who the district judge accepted as an expert? What about his testimony that having more residents was beneficial to the recovering addicts, that the more the better? Judge Graves, the problem I have with that is that there was no research or other data on which to base that opinion. He just kind of says, I think this is what you need to have. And I don't really have any studies or other data to support that. And that's a problem because, for example, if you look at the Oxford House model, there's been extensive studies that it works. The Addictive Behaviors Journal cited by the Oxford House v. Browning decision specifically talks about how it's been proven over time to be effective. And Dr. Baer just kind of says, I think this is the number. And even when you look at his testimony on that, he kind of says, well, 12 to 14 to 16, he kind of fluctuates on the different numbers. There's just no evidentiary basis behind that to establish that that is effective in treating. So the evidence isn't, well, I'm sorry, James, it's still your question. Go ahead, go ahead. But it seems to me, counsel, that once he's accepted as an expert and whatever went into his acceptance as an expert, whatever predicates there were for that, his testimony gets weight as an expert. And in his opinion, he stated certain things. You are really challenging the underpinnings for his opinion, sufficient evidence, whatever, but taking what he knows as an expert, he says what he says. Why isn't that evidence that the district court can rely on? When you're challenging his research, I think we're kind of beyond that when he's accepted as an expert with every challenge you may have made before he was so qualified. Judge Southwick, I think there's two issues with that. One, I don't think it should have been accepted at that testimony. And second, the other problem I have is if we're gonna rely an expert just to opine what they think, then at that point, our expert by Nancy Clark would be sufficient to show the six residents is enough for the court to accept at that point. And that gets back to why Vortscheimer is such an important case because it's not simply enough for them to say, Dr. Baer says this can be done. They had to also show that their program was better than the alternative accommodation that Parkstone offered of six residents. And that simply hasn't occurred. There's no discussion in a district court's decision about why six residents doesn't work specifically. It's just kind of a focus on the 12 residents with no analysis about six residents. And so I think those are the two problems with that as to why it shouldn't be given that weight. I mean, the whole notion on sober living being effective is because with the Oxford House, it's been studied over a course of years. There's just no data that to this day, we still have no idea the effectiveness of Harmony House at different residency levels. We don't know if it's more effective at six or eight. At trial, you know, with six residents, residents specifically stated that they were doing well and that it was working for them. And so if we're just gonna- So you agree that this group living is better than being in isolation. You're just quibbling about the number, whether six is better than 12 or eight or 10. That's what your problem is, what the number is. You agree that being in a group home or group setting is better for these addicts. I think a group home can serve its purposes, yes. But the question is, what is the number? And that becomes a quality versus quantity debate a little bit. So I think the argument's a little bit deeper than six versus eight. I think the argument is that quality sober living can be effective. And I see I'm out of time, your honors. Judge Sousek, may I ask a procedural question of attorney? I just wanna make sure, Mr. Hanson, did you have something further you wanted to respond to Judge Graves? I mean, don't let the clock ending prevent that from being said. Judge Graves, all I wanted to say is that you can have effective sober living at lower numbers and when Parkstone offered that lower number, that should be sufficient to satisfy the Fair Housing Act's necessity requirement. That's all I had to add. Mr. Hanson, I'm a little bit confused about the district judge saying you waived your breach of contract and Texas state law counterclaims and the briefs didn't help me much in that regard. As I understand it, obviously this was a two-day bench trial and then as is typical for bench trials, the judge directed both sides to file post-trial briefing to sort of summarize their positions and how they viewed the evidence, et cetera. So your brief says not only did you do that, but during the trial, you raised these points repeatedly. Is my understanding correct that this post-trial briefing, normally someone would think, oh, in a rule 12, I'm sorry, rule 50B motion, but that's not the case. This was simply your, in effect, post-trial briefs for the judge about the evidence that had been presented. That's correct, Judge Barksdale. The court's sua sponte basically said, hey, I think there's a waiver in the final decision. It had never been raised by any of the parties. There was no pretrial order in this case because we had an accelerated trial. And so there was no opening argument either in this case or even closing arguments. There were some comments after the trial ended. And so I think it would be hard pressed to find waiver here in a situation where we're admitting the contract that forms our breach of contract claim at trial and showing the breaches. If you look at the findings of fact, it extensively talks about the violations in the findings of fact and the declaration that's admitted as the contract. And so we should have had a permanent injunctive relief to stop future declaration violations. And so that's problematic because we now have a second lawsuit going on where there's more violations. So- Thank you. Thank you, Your Honor. All right, Mr. Whitburn, your turn. May it please the court. To prevail on their reasonable accommodation claim pursuant to the Fair Housing Act, plaintiffs had to make three basic showings that were disputed. First, that the sober living residents had issued certain individuals with disabilities. Second, that the accommodation requested on behalf of those individuals to allow 12 residents in the sober living residence was reasonable. And third, that the accommodation requested on behalf of those individuals was also necessary. The district court below made key factual findings on each of those issues to support its judgment for plaintiffs. And none of those factual findings was clearly erroneous. In fact, to overturn the district court's judgment, this court would have to announce sweeping new propositions of law that, for example, a group home and its residents can never avail themselves of the Fair Housing Act unless they can show the disability of every future resident on an individuated basis in a possible task, as the district court understood. And- Mr. Whitmer, it does seem to me that Mr. Hansen has at least a point that part of the analysis would seem to be what are the qualifications, what are the criteria for future residents? And do those criteria meet the requirements of the Fair Housing Act? What's your response to that? Yes, and I think that your honor was correct in indicating that the three residents that testified were evidence of the kind of person that comes into the sober living residence, but that's not the only testimony that was on in the record. Almost all of the residents that enter into the sober living residence come from a residential treatment center. That's at ROA 848-9. All of the individuals that come into this sober living residence have substance use disorder. That's at 848-50. Okay, what are those page references? Are those, I mean, what I'm wondering about it, does Harmony House require in some sort of formal way through written criteria or otherwise, what is sufficient to meet the Fair Housing Act? And are these record references you're telling me are just testimony of past practice or what are those references? The record references that I just cited, your honor, is testimony from the managing partner of Harmony House as to what the criteria are, what kinds of people are coming into his sober living residence into Harmony House. And basically- It could be two different things and I'm not trying to have you parse your sentences too much but the kinds of people who come in seems to be a historical practice. What is required would seem to be more, in some formal criteria, would seem to be more demanding. Are there written criteria that were introduced that would tell us if somebody doesn't have a life-limiting problem with his addiction would not be admitted? There are not written criteria of that sort on the record. I will note that this court in affirming the United States versus City of Jackson in 2004 affirmed that Southern District of Mississippi opinion in all respects. And the Southern District of Mississippi was looking at a situation where there were group homes for abused children. And basically the district court below in the Southern District of Mississippi indicated that, well, almost all of these kids that are coming here, basically they had one expert that said that all of these kids are, virtually all of these kids have disabilities that they formed over the course of their abuse in one way or another. There were no written criteria in that situation also. They had one expert that said, these kids are almost all end up being disabled. And the Fifth Circuit affirmed that in all respects. Here we have much more than that. We have a situation where the criterion for admission to the sober living residents is that they all have to have substance use disorder. They're all coming out of a treatment center, except for a very few that may be coming from another sober living residence that didn't work out for them. They are all in a situation where they have to reintegrate back into society. There's testimony on the record again from the same gentleman, the managing partner, that Harmony House functions to reintegrate them into society, meaning that at the treatment center, they were unable to have employment. They were unable to live on their own. They were unable to function in society. And it is Harmony House that serves as that reintegration mechanism. It bridges the gap between the treatment center when they can be on their own again. That's a quote from the record. So they're not able to be on their own when they're at the treatment center. They're not able to be on their own when they're coming right out of the treatment center. And it's only later on that they're able to do that. There's other testimony on the record that indicates that, and this is from a different, from one of the plaintiff's experts, an addictionologist that says, without the sober living residents, it would be very, very unlikely that the people he sees would ever be able to reintegrate back into society successfully. So the record evidence is that these individuals that are coming into Harmony House are people that are not integrated into society, that are not able to live independently. They're not able to live on their own. The testimony of the three individuals who are there in Harmony House already at the time of trial just reinforce that. The idea, for example, that KS is no longer disabled is just not in accordance with the case law. So for example, the Sixth Circuit in MX Group, and that's cited by the district court, the Sixth Circuit there examined this very issue. What it is, does a person no longer become disabled for purposes, in this case, it was for the ADA, but the Fair Housing Act analysis is similar. Does a person become no longer disabled because they go to a methadone clinic and are able to recover somewhat from their substance use addiction? And the answer that the Sixth Circuit gave was absolutely not, that it would be absurd to say that somebody who is disabled at one point and then recovers through the very mechanisms that the law allows for them is no longer disabled. And in fact, all of the individuals at Harmony House and even defendants expert testified to this, and that's at ROA 957, all of the individuals at Harmony House are people who still suffer from the risk of relapse. There's- Mr. Whitburn, along that line and your client's business model, why wouldn't it be as equally, and again, we have to be within the confines of the record, but it would seem you have this model where you have persons in various stages of recovery and you have the persons that have been in recovery longer and effect being mentors for the people that are just starting recovery in a sense. Why couldn't instead, you have six persons in recovery, that's three bedrooms, two persons to a room and have staff come in and be there during the day to give classes or whatever else. Now, it would cost more to a Harmony House and Harmony House wouldn't be making as much money, but still that would be equally effective perhaps. And again, we have to look at the evidence, but it seems it would be an alternative model that could be used in this house. The model that you propose, your honor, I think would not work for this particular house. The testimony of Dr. Arthur Bellow, one of the plaintiff's experts indicates that in a six bedroom house like Harmony House, you really need to have at least- See, Mr. Whitburn, that's the problem. Harmony House elected to buy a six bedroom house and now obviously wants to fill it up at $2,500 a month with 12 persons. But we can't let the business model drive what the law requires and then that gets into the necessity. So why wouldn't just staff, and again, if there's no evidence on this, don't reply, but it just seems saying we have to have all the people in the house being recovering addicts or alcoholics is just one point of view that the evidence would support. There's no evidence with respect to the model that your honor suggests. I will note that with respect to the law, the Fair Housing Act does not indicate merely that individuals with disabilities be permitted to live in some house and somewhere, but it protects the equal opportunity of individuals with disabilities to live in the housing of their choice. But the housing of their choice is the housing of Harmony House decided by the law. Of six bedrooms, which is a very large house. That's correct. But these individuals all chose to go there. And so for example, the resident DJ, I'll just use him for example. DJ specifically, he went to three treatment centers. He relapsed each time. The fourth time he went to a sober living residence that didn't have the structure, didn't have the accountability. He liked Harmony House precisely because it was in an upscale neighborhood. It had more people. And so he decided to go there. He was attracted to that model. So it's certainly Harmony House chose that house and chose the model, but it's these individuals recovering from substance use disorder that are choosing to go there. KS was in the same situation. He was in a situation where he believed for his purposes. And again, all of these models are very fact-intensive. Some models might work for some person, might not work for another person. For KS, he knew that 10 to 12, and this is in his record testament, he knew that he needed a group with high numbers. And that's why he chose the Harmony House model. If Harmony House had only had six people there, then he wouldn't have chosen that. Mr. Whitburn. Let me ask you, it seems to me your brief, what you and Judge Barksdale have been engaged in discussing is also raising your brief. And it's a concern to me about what actually is required by statute. Seems to me Harmony House could have bought a 10 bedroom house. And you'd be arguing that each one needs two people. It seems to me that what is necessary for the recovering addicts, for the disabled individuals, doesn't depend on the size of the house. It depends on what is necessary for group living, according to whatever the evidence is, to make that kind of facility effective for the handicapped individuals, not for the house. So it seems to me you lock the doors if the house is bigger than is necessary for the number of people to receive the benefits of the group living. Your brief seems to be, and I think your oral argument right now is saying the opposite. That they are entitled to enjoy the housing of their choice is a phrase I think from case law. It's in your brief anyway. Is that your position? You could say I'm a little hesitant to accept it, but I want to know, you're an expert as well as your companion is, Mr. Hanson. Is that your understanding? If they had a 10 bedroom house, you probably know what I said. If they have a 10 bedroom house, Harmony House is entitled on the FHA to put 20 people in it. I think that that would only rely on one side of the evidence that Harmony House has presented here. So Your Honor, in your discussion with my colleague, Mr. Hanson pointed at the other side of it, which is that the expert testimony also indicated that 12 was the critical mass number in this case. The- It doesn't depend on the size of the house. That did not mean- It would be a house that would accommodate 12 people in that expert's view. And if you have a bigger house than that, would the FHA say you could only put 12 people in it if you want to use the obligations imposed on Parkland, I'm sorry, on the Homeowner Association to require that whatever number of extra people our FHA requires? I think that if Harmony House had chosen to a 10 bedroom house, then Harmony House certainly would have, if Harmony House believed it required 20 people, it would certainly have presented evidence to that effect. I think that- What does it mean that you're entitled to enjoy the housing of your choice? Which is a phrase in your brief, which I think comes from case law, which may not have been dealing with anything like what we're talking about now. So phrases need to be taken in context, but context I'm talking about is a bigger house than your expert says is necessary for group living to work effectively. I think that if Harmony House had no evidence of the kind that we discussed earlier, that the expert says the 12 is the minimum number and the only thing it wanted to do. So for example, in the, I think the Smith and Lee Associates case, there was a 95 person enterprise that they were evaluating. I think there, if there were no evidence that 12 was the minimum number and all you had was a huge batch of rooms, then I think Harmony House would be hard pressed to show that the Fair Housing Act required that the HOA permit that. But I think that in that situation, there would be a whole host of other problems too, because you would have a problem with the reasonableness side of the analysis. You would have a problem with all kinds of different factors beyond just the necessity element. But luckily this court doesn't have to decide that issue here because there is the minimum, there is the testimony by critical mass on the record. The expert does testify that 12 is the minimum number. There is evidence that the alternative accommodation offered at six doesn't meet the therapeutic meaningfulness standard. It also, and the district court is clear on this in the record, the alternative offer of six doesn't even meet the financial viability standard. The district court found specifically that Harmony House could not stay afloat financially with six people, which was the alternative offered, that it needed more than that. So the only alternative offered was six, that doesn't work. 12 does, 12 is the minimum according to Robert Baer. The testimony about two in the room, I think is a supplement to that. If you're gonna have 12 in the house, that's the minimum. You also need that because you need two in the room. If they had, you know, in some outer bounds discussion, if they bought a house with 50 rooms, would they have the right under the Fair Housing Act to fill all of them? I don't think this court needs to decide that issue because the other testimony supports. I'm ready to decide that issue right now, 50 bedroom house, nonetheless, not before us. See, Mr. Whitman, you mentioned that if they only have six, that isn't enough to, you know, pay the mortgage that Harmony House took the risk of buying this big house. And I think we have to keep in focus, whom is the Fair Housing Act designed to help concerning persons with a handicap? And that's where, that's to me, the interesting question in this case. Not whether we wanna keep Harmony House, why Harmony House afloat, the owners who bought first and tried to get it approved later, as opposed to the persons who are in recovery that the Fair Housing Act assist. There are a number of other circuit court cases that indicate that financial viability is an appropriate issue to discuss under the Fair Housing Act, such as the Smith and Lee Associates. Are there some Fifth Circuit cases that support the financial viability aspect? There are no cases out of this circuit that support that idea. However, in this case, the testimony on the therapeutic model is clear that really the sober living residences that work with fewer residents, the testimony on the therapeutic, it'd be nice to have a big outdoor swimming pool with a waterfall that would be very disruptive of the other 59 houses in this area. I mean, it's just a complicated matter. That's true. And I think that the court can look at, again, at the Sixth Circuit case, Smith and Lee Associates. There, in order to determine necessity, there has to be a but for causation. It is a fairly strict standard, at least that some of these other courts have used. The idea is, well, is it true that but for the accommodation requested, the model would not work and the individuals would not have the equal opportunity to use, enjoy, and enjoy the dwelling of their choice. Now, with the swimming pool example, presumably, and I'm no expert on swimming pools and their therapeutic value, but presumably, somebody who was touting that standard or pursuing that accommodation, rather, would not be able to show that but for that swimming pool and its therapeutic value, the residents would not be able to have an equal opportunity to use, enjoy the dwelling of their choice. Here, however, there is ample testimony on the record that without the accommodation of 12, these individuals would not have the equal opportunity to use and enjoy the dwelling of their choice. For example, BJ, when at the time of trial, there were only six residents in this house. Councilor, your time is up. Any further questions from my colleagues? All right, Mr. Hanson. Yes, let me start with the financial viability argument for a second. I don't think that's before this court. It wasn't cross-appealed on the financial viability issue. The district court basically made a finding that they're not financially viable at 12. There hasn't been any type of cross-appeal on that issue. So those discussions, I think, are largely irrelevant here today. But to answer it, just so the court knows, there was testimony by the owner, Mr. Dan Rachete, the owner of Harmony House in the record at page 864 for the court's guidance, where he basically said that they would be profitable between six and seven residents. I think they could be profitable at six because they had things such as internet and marketing expenses. But even if you take the testimony at face value, it definitely doesn't support 12 residents being granted in this case. There's a substantial profit margin for Harmony House at 12 residents, which I think is important to note. Let me also address the argument that Mr. Whitburn made that you could never show future residents substantial limitations in major life activities. I don't think that's true. I think that's where the admissions criteria comes in. If you have the right admissions criteria, I think if you look at the Oxford Investments decision and even the Kearns case, the Eastern District of Texas case, both those courts seem to give some type of nod to future or potential residents. They don't come out and specifically say that, they don't have potential residents as the standard. So you can certainly meet that. And one of the things I really have a problem with here is the court is granting permanent injunctive relief against Parkstone to apply to future residents. And yet it's saying- Mr. Hanson, don't the Harmony House residents now come almost exclusively straight from inpatient treatment centers? The majority do come. I think the testimony at trial was that and sometimes they accept a few people from sober living homes. And in order to be eligible for admission to a treatment program, does an individual have to meet the DSM criteria for substance abuse or dependence? Not necessarily. The evidence isn't in the record. First of all, that they accept people from treatment facilities that follow those regulations. But the more glaring error, Judge Graves, is those regulations discuss substance abuse. They do not discuss substantial limitations in a major life activity, which means that you cannot rely upon those regulations to supply the missing evidence. The regulations don't discuss substantial limitations in a major life activity. So even though we don't have evidence in this record that Harmony House accepts people from treatment centers that actually follow those regulations, even if we did, those regulations go to the impairment aspect as do a lot of the record citations from Mr. Whitburn that substance abuse goes to impairment. It does not go to whether there's a substantial limitation in a major life activity. And so the regulations basically don't apply here whatsoever or there wasn't evidence to show that they can rely upon it. Either way, they're not helpful here for this particular matter. So I think that the other thing to keep in mind is that they're requesting a permanent injunction in the future. And it seems really bizarre to me to say that Parkstone is gonna have to give an accommodation to future residents, and yet there's no evidentiary showing being required on those future residents. It's not lining up. The relief given isn't lining up with the evidentiary support, which I think is somewhat astounding to do that. I think Vorzeimer had this right, that the analogy they kind of used was food and candy. I think six residents is the food here. It's what's necessary to ameliorate drug and alcohol addiction. I think 12 is candy. It's just not essential to ameliorate drug and alcohol addiction. And the only final thing I'd like to throw in is that I don't think the ADA and the Fair Housing Act are identical in all respects. The Fair Housing Act does not have a remission standard like the Americans with Disabilities Act does when the Amendments Act was passed in 2008. And that is the reason why Witness KS is not handicapped. There is not a remission standard where you can say if someone's fine. Witness KS was not handicapped when he entered the house. It's not an argument that Harmony House worked. And we tried to claim that he was handicapped. He wasn't handicapped to begin with from the second he entered in. And so for these reasons, I respectfully request that the district court be reversed with a finding of six or less residents and other relief as set forth. Thank you. Thank you both, counsel. Very helpful argument. As the last argument of the week, we are adjourned.